**Harry W. Kinney, Appellant, v. The Rochester German Insurance Company, Appellee.**

### Gen. No. 13,895.

1. INSURANCE—*when notice of cancellation insufficient.* A notice by the company of a desire to cancel a fire insurance policy is insufficient to effect the object if not given to the insured or to some one authorized by the insured to receive such notice. An insurance broker authorized by the insured to obtain the insurance is not an agent for the purpose of receiving such notice.

2. INSURANCE—*extent of authority of agent to procure.* An agent to procure insurance has no authority to surrender or cancel the policy obtained or to receive the return of the premium upon cancellation.

3. INSURANCE—*what essential to effectuate cancellation by company.* In order to effectuate a cancellation by the company, it must tender to the insured the unearned premium.

4. INSURANCE—*what not misrepresentation which will avoid fire policy. Held,* that the evidence in this case did not show a misrepresentation or concealment as to the nature of the risk which rendered the policy void.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. EDWARD A. DICKER, Judge, presiding. Heard in this court at the October term, 1907. Reversed and judgment here. Opinion filed June 11, 1908.

MORRIS ST. P. THOMAS, for appellant.

BATES, HARDING & ATKINS, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

In the Municipal Court this action was by Harry W. Kinney as plaintiff against The Rochester German Insurance Company as defendant. It was submitted to the court without a jury, and the court found the issues for the defendant and gave judgment for costs. From this judgment the plaintiff appealed to this court,—the cause being of the first class under the Municipal Court Act. The questions in it arise under the affirmative defenses made by the defendant. There is no dispute about the *prima facie* case made by the plaintiff. The suit was brought in *assumpsit* on a policy of fire insurance for $1,500 issued to the plaintiff on a two-story brick building, with brick and frame additions, situated at numbers 933 to 959, inclusive, One Hundred and Twentieth street, being on the southeast corner of South Peoria street, West Pullman, Chicago, Illinois. The policy ran from June 29, 1906, to June 29, 1907.

There was a fire loss on the premises to the amount of $32.50 on July 1, 1906, and the defendant paid to the plaintiff its *pro rata* share of said loss, being $3.75.

The defendant's liability under the policy was thus reduced to $1,496.25.   October 26, 1906, the property covered by the policy was again damaged by fire to the extent of $20,370.66.   The value of it was then $24,-233.78.   Proper proofs of loss were made and delivered to the company, but the company refused to pay any part of the loss.

These matters were set out in the declaration.   A stipulation embodying them was also made at the trial and read in evidence.   The stipulation also contained statements that the defendant issued and delivered the policy in question through George Hermann & Co., its managers at Chicago; that from the time of the issuance of the policy to the time of the trial George Hermann & Co. had been defendant's managers and general agents at Chicago; that during the same time the plaintiff had been a resident of Cincinnati, Ohio, and that defendant had been a non-resident corporation without a principal office in Chicago, but with an agent within the First Municipal Court District of said city.

The stipulation also fixed the liability of the defendant to the plaintiff, if it were liable in any amount, at the sum of $1,496.25, with interest thereon at the rate of 5 per cent. per annum from February 18, 1907.

The defendant company, under the general issue pleaded, claimed that these two defenses were established by the evidence: First, that the policy had been canceled by written notice to the assured, and expired by virtue of such cancellation on October 24, 1906, the day before the fire occurred; and second, that the policy was void from the beginning, because there were misrepresentations and concealments made by the assured's agent at the time of the application.

The policy contained the provision: "This policy shall be void if the insured has concealed or misrepresented in writing or otherwise any material fact or circumstance concerning this insurance or the subject thereof."   And under this clause it is claimed that the policy was void when issued, inasmuch as some person

representing the assured represented to the agent of the defendant from whom the policy was procured, at the time it was procured, that the property was occupied as a scale factory only, and concealed from him the fact that it had in it also a candy factory.

The trial judge, by holding certain propositions of law submitted by the plaintiff and refusing to hold certain propositions offered by the defendant, signified his disagreement with the first of these propositions, on the twofold ground (a) that the service of notice of the attempted cancellation was not made on the plaintiff, or on any authorized agent of his for that purpose, but only on insurance brokers who had obtained the policy for the plaintiff; and (b) that the return or offer to return the unearned premium for the unexpired term was a condition precedent to cancellation; and that no such return or offer to return said unearned premium or anything tantamount thereto occurred.

Plaintiff, citing Vose v. Strong, 144 Ill. 108, 113, as authority, contends in his reply brief that in the absence of the assignment of cross-errors by the defendant on these holdings by the trial judge, the defendant must be held to have acquiesced in that finding, and that there is no contention, therefore, before us that the policy was cancelled. This is, at the very least, a doubtful proposition. In Borden v. Croak, 131 Ill. 68-77, the same judge who delivered the opinion in Vose v. Strong declared that it was an obviously unsound one. The question being, the court said, whether the trial judge, upon the facts presented and the rules of law applicable thereto, reached a correct judgment, the mode of reasoning upon which he proceeded was immaterial. He might have given the wrong reason for a right conclusion, and yet the judgment would have to be affirmed.

But the question involved is an academic one in this case, except as it justifies us in briefly noting our rea-

sons for agreeing with the position taken by the trial judge on this point.

The evidence shows that H. D. Cummings & Company are insurance brokers in Chicago, and that on or about June 29, 1906, they applied by an employe to George Hermann & Company, fire insurance agents in Chicago, for a policy of insurance on the property here involved. There was a habit of transactions between Cummings & Co. and Hermann & Co., evidently, which had made a running account between them that was settled every month. George Hermann & Co. were the agents for Chicago and Cook county of the Rochester German Insurance Co., for which they issued policies. They issued one in this case running to the plaintiff, in whose name it was applied for. As originally issued it contained this clause: "It is understood that Joseph N. Kinney holds a life interest in the property."

On October 15, 1906, a settlement between Cummings & Co. and George Hermann & Co. resulted in the payment of the premium of $32.51 by the former to the latter. This premium was at the rate, therefore, of $21.67 a thousand.

A written or printed application for the insurance was handed to George Hermann & Co. by Cummings & Co. when the policy was issued, together with the written and printed form describing the property to be insured, which was to be attached to the regular form of the defendant's policies. This attached form is headed: "The Chicago Board of Underwriters of Chicago. Commercial Building Form with occupancy and contribution clause adopted Jan. 11, 1906."

The description of the property before quoted contains no statement of the use to which it was put. A clause following the description reads: "Permission granted for the use of the premises as at present and for other purposes not any more hazardous and to keep and use all articles and materials usual to the business conducted therein, but the use, handling or storing of

benzine, benzole, gasoline, naphtha, calcium carbide or fireworks is prohibited unless a special permit is attached hereto."

H. D. Cummings & Co. were employed as insurance brokers to procure insurance for the property in question by one William L. McCague, who was a real estate agent in Chicago, and who had had charge and management of the property for the non-resident owner for over three years. Mr. Kinney testified that this agent looked after the insurance, and that he personally never saw any member of the firm of Cummings & Co. until after this suit was begun.

Mr. McCague, on receiving policies of insurance on the property, would forward a memorandum of them to Mr. Kinney, but keep the policies himself. This was the course adopted with the policy sued on here.

Although the policy is dated July 2, 1906, it was to cover the period between June 29, 1906, and June 29, 1907, and on July 1, 1906, as before stated, there was a small fire loss on the property, of which the defendant's *pro rata* share was $3.75. A proof of loss was duly made by Mr. Kinney and signed by him, and the amount was on payment receipted for by him personally. It was paid in connection with the *pro rata* contribution to the loss of two other companies represented also by George Herrmann & Co., by a check of George Herrmann & Co. to the order of Harry W. Kinney, dated August 24, 1906. The check was indorsed by Mr. Kinney and by the Merchants National Bank of Cincinnati, and paid through the Chicago Clearing House on October 19, 1906. At some time not appearing in the record there was indorsed on the policy, as evidencing this payment, "Loss, $3.75. Date July 1, 1906. Paid Aug. 23, 1906."

September 27, 1906, Mr. McCague sent the policy in question, which had been in his possession from a few days after its issuance, to Cummings & Co.'s office, together with others. Although he was not allowed by the court to testify for what purpose he so sent them,

the indorsement by Herrmann & Co. on that date on
the policy sued on, of the understanding that the life
interest of Joseph N. Kinney had ceased, would seem
to indicate that the said purpose was to secure this
indorsement through Cummings & Co.'s agency.  Cum-
mings & Co. did not return the policy to McCague after
securing this indorsement, but held it, as indicated by
subsequent transactions, either to secure a reduction of
rate and a rebate on account of the removal of gaso-
line from the premises, or for some other reason.  Be-
fore Cummings & Co. had carried the policy to Herr-
mann & Co. for this purpose, however, Herrmann &
Co., having occasion to send an inspector to the vicinity
of the property in question to investigate another risk,
told the inspector that they "were interested in an-
other building in the same block" (meaning the plaint-
iff's property), and asked him to look that up also.  "I
called his attention to this Kinney building," says Mr.
Sweetland of the firm of Herrmann & Co., "and told
him we had no inspection of that risk or the occu-
pancy—what it was—and while he was there, he had
better take that in too."  The inspector reported to
Mr. Sweetland that there was a candy factory in the
building—a fact which Mr. Sweetland says he never
had known before.  On hearing this, and because a
candy factory is, as he says, very hazardous, he ordered
the policy cancelled.

The policy contained this usual cancellation clause:

"This policy shall be cancelled at any time at the
request of the insured; or by the company by giving
five days notice of such cancellation.  If this policy
shall be cancelled as hereinbefore provided, or become
void or cease, the premium having been actually paid,
the unearned portion shall be returned on surrender of
this policy or last renewal, this company retaining the
customary short rate; except that when this policy is
cancelled by this company by giving notice, it shall
retain only the *pro rata* premium."

In supposed exercise, evidently, of the option given

by this clause, the following letter was on October 19, 1906, delivered by Herrmann & Co. to Cummings & Co.:

"CHICAGO, October 19th, 1906.
H. D. CUMMINGS & Co.,
    Chicago, Ill.

We desire to cancel the following policies issued to Harry W. Kinney and insuring property at 933-959 120th Street, viz:

Rochester German, Policy No. 126291, Amt. $1,500.
Buffalo German, Policy No. 63052,    Amt.  1,000.
Caledonian, Policy No. 1685202,    Amt.  1,000.

You will be allowed until October 24th at noon to replace the same, after which time all liability under said policies will cease and determine. We credit your account with the unearned premium for the unexpired time, and request you to return same to this office on or before this date mentioned.

GEO. HERRMANN & Co.,
    Agents."

October 22, 1906, a messenger from H. D. Cummings & Co. brought in the policy in question and others to George Herrmann & Co., and received a receipt for them from George Herrmann & Co. worded as follows:

"October 22, 1906.

Received below listed policies on bldg. of Harry W. Kinney for rebate to 172 plus 10% from Aug. 31, 1906, for gasoline removed and return to office of H. D. Cummings & Co."

Then follows a list of ten insurance policies of different companies, among them the one in suit.

On October 23, 1906, Herrmann & Co. placed this indorsement on the policy:

"Rate reduced to 1.892 from 8/31/'06 for improvements and $3.39 rebate refunded assured. Chicago, 10/23/'06.

GEO. HERRMANN & Co., Managers."

This amount of $3.39, however, was not paid over to anybody by Herrmann & Co., but was credited to H. D. Cummings & Co. in the books of Herrmann & Co., on

the running account between Herrmann & Co. and H. D. Cummings & Co.

Early in the morning of October 25, 1906, the fire on which the loss is claimed in this suit occurred. Before it was known, however, to George Herrmann & Co. or H. D. Cummings & Co., a clerk from the latter office called at Herrmann & Co.'s office, just after the opening hour, and was told by Mr. Sweetland that Herrmann & Co. had figured the return premium on account of the cancellation. Cummings & Co.'s clerk then figured it over with Herrmann & Co.'s clerk, and put down figures on a card of Herrmann & Co.'s, which he seems to have taken away with him, leaving the policies with Herrmann & Co. The figures were as follows:

|  | "Rebate. | Ret. Premium. |
|---|---|---|
| Cal. | 2.26 | 12.96 |
| R. G. | 3.39 | 19.44 |
| B. G. | 2.26 | 12.96 |
| 1685202 Cal. 15.22 | | |
| 126291 R. G. 22.83 | | |
| 63052 B. G. 15.22." | | |

The same day, having placed a notation on the policy as follows: "Cancelled October 24, 1906; returned premium *pro rata* $19.44 by company, credit Cummings & Co.," Herrmann & Co. sent the policy to the head office of the company at Rochester, where it was received October 27, 1906. The plaintiff demanded it from Herrmann & Co. on October 27th, but they refused to comply with said demand, but produced it on the trial of the cause. Mr. Kinney testified: "I never received any notice from the Rochester German Insurance Company or its agents of any intention on their part to cancel this policy. Neither the defendant nor George Herrmann & Co. ever paid or offered to pay me any portion of the return premium."

This statement of the evidence is sufficient to show, we think, that no proper notice under the cancellation clause in the policy was given to the plaintiff nor the requisite repayment of premiums to him made. H. D.

Cummings & Co. were simply the insurance brokers for the plaintiff. It does not appear that they had or assumed to have any authority to receive either notice of cancellation or premium rebate for him. It is very probable that if this fire loss had not unfortunately occurred when it did, a few days later the cancellation would have been properly accomplished by the assent of the assured. Cummings & Co. would very probably have notified the plaintiff or his agent, McCague, who would have passed the notification on. At the same time they might have paid over the rebate and requested Kinney's personal receipt to the defendant for it. The plaintiff, recognizing the right of the company to secure the cancellation at its option, might, for convenience, and probably would, have recognized the notice coming this way and have accepted and receipted for the money and procured other insurance. No question would then have arisen. This is very possibly what Herrmann & Co. expected would be the course of things, although when they had $3.75 to pay as a fire loss on this policy they did not rely on crediting Cummings & Co. with the money and having Cummings & Co. advance it to the insured, but paid it with their own check. But in any event their action in dealing with Cummings & Co. was at their own risk, and was, as we conceive, very possibly at the time so understood by them. The chances were heavily against a loss until the arrangement could be consummated, and for convenience they took them. But the relations of H. D. Cummings & Co. to the assured were not altered thereby. If the business had been finally transacted through them,—as their action in receipting for the notice and checking up the proportionate repayment to be made, without demanding the policy which had evidently been left with them, and by them with Herrmann & Co., not for surrender but for indorsement, indicated that they expected it would be,—they would have been, until the said business was consummated, the agents of the insurer, not of the insured, in it.

Their employment by Mr. Kinney through his agent to procure the insurance gave them no authority to surrender or cancel the policy, or to receive the return premium on cancellation. Newark Fire Ins. Co. v. Sammons, 110 Ill. 166; Grace v. American Central Ins. Co., 109 U. S. 278; White v. Connecticut Fire Ins. Co., 120 Mass. 330; Indiana Ins. Co. v. Hartwell, 100 Ind. 566; Hartford Fire Ins. Co. v. McKenzie, 70 Ill. App. 615; Hartford Fire Ins. Co. v. Tewes, 132 Ill. App. 321.

We think, moreover, that the opinions of the learned judge of the Appellate Court in the Second District, in the last two cases cited, are entirely sound in stating the rule in Illinois to be as it is in New York (Tisdell v. N. H. Fire Ins. Co., 155 N. Y. 163), under the cancellation clause in New York Standard Policies, such as the one involved here, that "the insured does not have to tender his policy in order to entitle him to receive back the unearned premium, but it is for the company desiring cancellation to seek the assured and tender the money to him, and until it does so, the cancellation has not been effected."

No such tender was shown here. The "crediting" Cummings & Co. "with the unearned premium for the unexpired term" was not such a return or tender. The court below was right in holding that the policy was not cancelled by the actions of Herrmann & Co. on and subsequent to October 19, 1906.

But we do not agree with the trial court in holding the second ground of defense better established.

The defendant argues, and we presume that the trial judge must have proceeded upon the theory, that there was, first, a concealment, and, second, a misrepresentation, of the character of the risk when the policy was procured, which rendered it void from the beginning.

The concealment alleged is that when the policy was applied for, the insurer was not told that there was a candy factory (an extra hazardous risk) in the building, and the misrepresentation is imputed to an alleged

statement of Alexander M. Ross, or some other employe of Cummings & Co., to Mr. Sweetland, as the agent of the insurer, at the same time, that the building was occupied as a scale factory, while as a matter of fact there were both a scale factory and a candy factory there. The testimony of Mr. Sweetland as to this is as follows:

"Q. What did he" (*i. e.,* Ross) "say to you and what did you say to him? A. He handed me the application.

Q. Have you the application now? A. I have not, it must have been destroyed.

\* \* \* Q. What did you say to him and what did he say to you? A. Well, he asked me to turn up the map and our map showed— \* \* \* it was occupied, by Gibson & Co., photo enlarging \* \* \* I asked him if the map showed the occupancy correctly and he said no, it did not; that those people had moved out and that a scale factory had moved in there and that it had not been pasted on the map yet. \* \* \* He said the present occupancy of the building was that of a scale factory and that the map was incorrect."

Mr. Ross denied that he applied for the policy, and denied that he had ever had any conversation with Sweetland with reference to the building in question or with reference to placing insurance thereon, and there the direct testimony stops.

Counsel for defendant say that "nobody denies what was said at that time," and assumes that if what was said was not said by Ross it was said by somebody else who represented the assured. But Mr. Sweetland's testimony was positive that it was Ross and not somebody else who talked with him.

Leaving out of the account, however, the obvious proposition that the defendant is here undertaking to establish a position on which it has the burden of proof by the testimony of one witness who is flatly contradicted by another, and assuming the plaintiff's hypothesis that Mr. Ross is mistaken, or that some other em-

ploye of Cummings & Co. had the conversation with Mr. Sweetland testified to by the latter, we think the evidence falls short of bringing this case within the scope of those universally recognized authorities which counsel cite, that fraudulent concealment or material misrepresentation or even false statements ignorantly made, in answer to questions concerning occupancy precisely put, where the respondent should have known the facts, will vitiate the policy, if relied on by the insurer when issuing it. On the contrary, we think that if, in this case, assuming the testimony concerning this conversation to be literally true, the policy should be held void *ab initio,* the doctrine would be very dangerous to any assured party procuring a policy through a broker or agent. Undoubtedly the agent, to secure the insurance, must be held to represent the insured, but his conversation with a similar agent or broker must be construed somewhat with reference to the business of both.

In this case it appears that the broker's employe brings to the insurer and leaves with him a written application, which is the best evidence of the representations made. That application the insurer cannot produce and acknowledges was destroyed. The form describing the property, to be attached to the insurance policy, contains no statement of the use or occupancy of the building. The applicant on the application calls attention himself to the insurance map and says that it is incorrect. Why he should do so, if he intended concealment, or misrepresentation, does not appear. The "precise" question asked him was whether the map showed the occupancy correctly. His answer to that is conceded to have been truthful. But he is said by Mr. Sweetland to have said besides that the present occupancy was that of a scale factory. There was a scale factory there and also a candy factory, it seems.

Mr. Sweetland says: "Every quarter or thereabouts the map company furnishes us with new diagrams of buildings, and as buildings are altered or

changed they send around and paste over the occupancy of the building."

When the book was produced at the trial it had a paster showing both the scale factory and the candy factory. When it was placed there, except that it was after June 29, 1906, when the policy was applied for, does not appear.

But it certainly does appear that the insurers did not rely on any silence or misrepresentation of the clerk or messenger who talked with Mr. Sweetland, for according to Mr. Sweetland's own testimony they charged as premium more than the Board of Underwriters' rate for the risk of a scale factory, and exactly the rate for a candy factory. Moreover, for three months and a half, within which, according to Sweetland's testimony, this paster must have appeared in the book, they make no investigation, but at the end of that time, when the occasion is convenient, say to an inspector that "they had no inspection of that risk or the occupancy there—what it was—and he had better take it in." Then when they have concluded they do not want the risk, they do not ask when the occupancy first became that of a candy factory, or make any claim that the policy is void, but fix a date five days farther on at which, according to their claim, it was to terminate, and calculate the earned premium upon a risk carried for the three months and more.

We do not think there was any ground in the record as it stands for the court's holding that there was concealment or misrepresentation in this case vitiating the policy; and acting on that opinion we shall, as authorized to do, enter that judgment which the Municipal Court, sitting without a jury, should, in our opinion, have entered.

This renders it unnecessary for us to discuss the questions raised on the necessity of tendering a return of the premium in defending on the policy, or of the efficacy of the tender through the registry of the Municipal Court.

It renders also unnecessary a discussion of the error of the trial court—for such we deem it—in excluding the rate slips offered in evidence by the plaintiff, Nos. 563 and 611. They contained information that the premises in question were in part occupied by a candy factory as far back as May 24, 1906. They were sufficiently proven to have been in Herrmann & Co.'s possession at or near their dates. As a matter of fact it was a fair and legitimate inference that rate slip 563 furnished the data on which the premium charged was calculated.

If we did not feel compelled to render judgment here for the appellant for the amount due him, we could in no event have overlooked this error, and must have reversed the judgment and remanded the cause for a trial with this material evidence admitted.

The judgment of the Municipal Court is reversed and judgment will be entered here in favor of appellant and against appellee for $1,496.25, with interest thereon at 5 per cent. per annum from February 18, 1907, to the date of said entry.

*Reversed and judgment here.*